UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| BOARD OF TRUSTEES OF THE AUTOMOBILE )<br>MECHANICS' LOCAL NO. 701 UNION AND )<br>INDUSTRY WELFARE FUND; and )<br>BOARD OF TRUSTEES OF THE AUTOMOBILE )<br>MECHANICS' LOCAL NO. 701 UNION AND )<br>INDUSTRY PENSION FUND, )<br>)<br>Plaintiffs, )<br>)<br>v. )<br>)<br>BELAND & WIEGERS ENTERPRISES, INC., )<br>an Illinois Corporation, )<br>DANIEL J. BELAND, an individual, and )<br>BERNARD WIEGERS, an individual, )<br>)<br>Defendants. ) | Judge Joan B. Gottschall<br><br>No. 13 CV 1611 |

## MEMORANDUM OPINION & ORDER

On June 3, 2013, Plaintiffs Board of Trustees of the Automobile Mechanics' Local No. 701 Union and Welfare Fund and Board of Trustees of the Automobile Mechanics' Local No. 701 Union and Industry Pension Fund (collectively, "Plaintiffs") sued Defendants Beland & Wiegers Enterprises, Inc. ("B&W"), Daniel J. Beland ("Beland"), and Bernard Wiegers ("Wiegers"). Plaintiffs alleged that B&W breached its collective bargaining agreement ("CBA") in violation of ERISA and that all Defendants were responsible for the full amount of withdrawal liability as a result of B&W's complete withdrawal from the pension funds. After discovery, Plaintiffs moved for summary judgment. On August 21, 2014, this court entered summary judgment against B&W and denied summary judgment against Beland.

Now before the court is Plaintiffs' motion for reconsideration of the court's order

denying summary judgment as to Beland as an individual. For the reasons detailed below, the court grants Plaintiffs' motion for reconsideration and vacates its August 21, 2014 Order.

## I. Facts[1]

Beland is the sole owner of B&W, an Illinois corporation. He became the sole owner in 2005 when his partner, Wiegers, retired and Beland instituted a buyout. In 2010, B&W entered into a CBA with the Automobile Mechanics' Local Union No. 701. As part of the CBA, B&W agreed to be bound by the provisions of the Agreements and Declarations of Trust ("Trust Agreements"), which in turn created a pension fund and a welfare fund ("Funds")[2]: the Automobile Mechanics' Local Union No. 701 and Industry Pension Fund and the Automobile Mechanics' Local No. 701 Union and Industry Welfare Fund.

The CBA and Trust Agreements required B&W to contribute monthly to the Funds for each week that a covered employee performed any work at the negotiated rate. If B&W failed to submit a timely monthly payment, the Trust Agreements required B&W to pay the contribution, liquidated damages (10 percent of the unpaid amount), and reasonable attorney's fees and costs.

On or about September 19th or 20th, 2012 – approximately two years into B&W's collective bargaining agreement with Plaintiffs – B&W ceased all covered work and

---

[1] Northern District of Illinois Local Rule 56.1(a) requires parties moving for summary judgment to submit a statement of material facts. Local Rule 56.1(b)(3)(C) states: "[a]ll materials set forth in the statement required of the moving party will be deemed to be admitted unless controverted by the statement of the opposing party." Plaintiffs filed a Local Rule 56.1 Statement of Material Facts (ECF No. 24). Defendants failed to file a response. Thus, the court deems Plaintiffs' facts admitted, and the facts that follow are taken primarily from Plaintiffs' statement and its supporting materials.
[2] The Funds are synonymous with the Plaintiffs in this case.

ceased making contributions to Plaintiffs. As a result, B&W owed Plaintiffs $5,020.50 (plus liquidated damages) for the unpaid contributions in September and October 2012. As a result, Plaintiffs notified Defendants that this constituted a complete withdrawal that triggered withdrawal liability under ERISA. In March 2013, Plaintiffs sent B&W a notice and demand for payment of withdrawal liability in the amount of $261,052.00, along with a quarterly payment schedule. B&W failed to make its first quarterly payment, prompting this suit.

Defendants did not request a review of the withdrawal liability assessment or initiate arbitration to challenge Plaintiffs' assessment. Calculations for money owed based on the terms of the agreement include $5,522.55 to Plaintiffs for the breach of contract claim,[3] $292,867.13 for the withdrawal-liability claim,[4] and attorney's fees and costs.

At the time of B&W's withdrawal, Beland was the sole owner of both B&W and of property located at 11625 South Ridgeland, Alsip, Illinois. B&W operated out of the South Ridgeland property. According to Beland's deposition testimony, B&W paid Beland monthly rent to use the property for its business.

## II. LEGAL STANDARD

Motions to reconsider serve the limited function of allowing the court to correct manifest errors of law or fact or to consider newly discovered material evidence. *Seng-Tiong Ho v. Taflove*, 648 F.3d 489, 505 (7th Cir. 2011). A "manifest error" occurs when "the [c]ourt has patently misunderstood a party, or has made a decision outside the

---

[3] This amount consists of $5,020.50 in contributions and $502.50 in liquidated damages.
[4] This amount consists of $261,052.50 for withdrawal liability, $26,105.20 for liquidated damages, and $5,709.93 in interest.

3

adversarial issues presented to the [c]ourt by the parties, or has made an error not of reasoning but of apprehension." *Bank of Waunakee v. Rochester Cheese Sales, Inc.*, 906 F.2d 1185, 1191 (7th Cir. 1990).

### III. ANALYSIS

The following statutory regime lays out the pertinent rules governing employer liability under ERISA. A complete withdrawal from a multiemployer plan occurs when an employer permanently ceases to have an obligation to contribute under the plan or permanently ceases all covered operations. 29 U.S.C. § 1383(a). Once complete withdrawal occurs, the plan sponsor must notify the employer of the amount of liability, submit a payment schedule, and make a demand for payment in accordance with the schedule. 29 U.S.C. § 1399. If an employer defaults by failing to make timely payments, the plan sponsor:

> [m]ay require immediate payment of the outstanding amount of an employer's withdrawal liability, plus accrued interest on the total outstanding liability from the due date of the first payment which was not timely made . . . if the failure is not cured within 60 days after the employer receives written notification from the plan sponsor of such failure . . . .

29 U.S.C. § 1399(c)(5). The employer may initiate arbitration to dispute a withdrawal liability assessment. *See* 29 U.S.C. § 1401(a)(1). If no arbitration proceeding is initiated, the plan sponsor may bring suit to enforce collection. *See* 29 U.S.C. § 1401(b)(1).

Withdrawal liability may also be imputed to individuals. *Central States, Se. & Sw. Pension Fund v. Personnel, Inc.*, 974 F.2d 789, 792 (7th Cir. 1992). To determine whether withdrawal liability may be imputed to an individual, the court must determine whether the individual qualifies as a "single employer." *Id.* A "single employer" exists under § 1301(b)(1) when "all employees of trades or businesses (whether or not

4

incorporated) . . . are under common control [of an individual or entity]." *Id*. All trades or businesses that meet this definition are treated as a "single employer." *Id*.

To determine whether a "trade or business" exists, the Seventh Circuit traditionally applies the standard announced in *Comm'r v. Groetzinger*, 480 U.S. 23 (1987). *See Cent. States, Se. & Sw. Areas Pension Fund v. SCOFBP, LLC*, 668 F.3d 873, 878 (7th Cir. 2011). Under *Groetzinger*, a "trade or business" exists when an entity or individual has "engaged in an activity (1) with continuity and regularity (2) for the primary purpose of income or profit." *Groetzinger*, 480 U.S. at 35.

In recent years, the Seventh Circuit has applied the "Leasing Property Rule" in addition to the *Groetzinger* standard. *SCOFBP*, 668 F.3d at 873 (7th Cir. 2011). The Leasing Property Rule provides that "leasing property to a withdrawing employer itself is categorically a trade or business." *Id*.

In *SCOFBP*, the Seventh Circuit applied the Leasing Property Rule in an ERISA case to determine whether two solvent business entities were liable for an insolvent affiliate's withdrawal liability. *Id*. at 876. A defendant, SCOFBP, LLC ("SCOFBP") was part of a complex set of business entities that included two solvent entities: MCRI/Missouri, LLC ("MCRI") and MCOF/Illinois, LLC ("MCOF"). *Id*. A single individual, Michael Cappy ("Cappy"), controlled all three entities (SCOFBP, MCRI, and MCOF). *Id*. In this arrangement, MCOF owned a lumberyard that SCOFBP used and leased. *Id*. at 877. After SCOFBP stopped paying into the union's pension fund, thereby incurring withdrawal liability, plaintiffs sought to hold MCOF liable for SCOFBP's withdrawal liability by arguing that (1) MCOF engaged in a "trade or business" by leasing property to SCOFBP and (2) SCOFBP and MCOF were under the "common

control" of the same individual, Cappy. *Id*. at 877. The plaintiffs argued that these two factors were sufficient to satisfy *Groetzinger*. *Id*.

The Seventh Circuit agreed, finding that MCOF satisfied the *Groetzinger* standard because it leased property to the withdrawing employer, SCOFBP. *Id*. at 878. The court looked to the purpose of the withdrawal liability statute, which is "to prevent the dissipation of assets required to secure vested pension benefits." *Id*. (citation omitted). With this purpose in mind, the Seventh Circuit stated that "leasing property to a withdrawing employer is a 'trade or business'" because leasing property is 'an economic relationship that could be used to . . . dissipate or fractionalize assets.'" *Id*. (citation omitted). The Seventh Circuit applied the Leasing Property Rule and found MCOF liable for the unpaid withdrawal liability. *Id*. In doing so, the court sought to "protect the solvency of multiemployer pension plans," by "pierc[ing] the usual legal barriers between affiliated but legally distinct businesses." *Id*. at 876.

In subsequent years, the Seventh Circuit has repeatedly pierced legal barriers between affiliated businesses by applying the Leasing Property Rule. In *Cent. States, Se. & Sw. Areas Pension Fund v. Messina*, the Seventh Circuit addressed the scope of liability that could be imposed on a withdrawing employer's related businesses. *Messina*, 706 F.3d 874 (7th Cir. 2013). An entity called Messina Trucking ("Messina Trucking") was subject to a collective bargaining agreement that required it to contribute to a pension fund for its employees' retirement benefits. *Id*. at 877. After several years of making contributions, Messina Trucking permanently ceased to have a contribution obligation and incurred millions of dollars of withdrawal liability. *Id*. The pension fund sued Messina Trucking as well as the owners of the trucking business, Stephen and Florence

Messina (the "Messinas"). The pension fund sought to impose liability on the Messinas individually based on the fact that the Messinas owned and leased a property to Messina Trucking. *Id*. However, the district court rejected the pension fund's argument and held that the Messinas were not engaged in a "trade or business" and thus not liable for Messina Trucking's withdrawal liability. *Id*.

The pension fund appealed, and the Seventh Circuit reversed the district court's decision that the Messinas were not engaged in a trade or business. *Id*. The Seventh Circuit explained that the lower court had reached its decision "without the benefit of . . . *SCOFBP*, issued after the court's decision." *Id*. at 881. The Seventh Circuit explained that it was bound by *SCOFBP*'s "teaching that renting property to a withdrawing employer is 'categorically a trade or business.'" *Id* at 880. Applying *SCOFBP* to the district court ruling, the Seventh Circuit reversed, holding that the Messinas were engaged in a "trade or business" and were liable for Messina Trucking's withdrawal liability. *Id*. at 882. The court further noted, "where the real estate is rented to or used by the withdrawing employer and there is common ownership," it is likely that a "true purpose and effect of the 'lease' is to split up the withdrawing employer's assets," and that liability should thus be imposed on the entity or individuals who lease the property to the withdrawing employer. *Id*.

The Messinas attempted to attack *SCOFBP* by arguing that it is not "good law because instead of relying on *Groetzinger* and its two-part test, [*SCOFBP*] relied instead on the underlying purpose of the statute – to prevent the fractionalization of assets." *Id*. The Seventh Circuit rejected the argument and made it clear that *SCOFBP*'s conclusion that "an owner's or related entity's leasing of property to a withdrawing employer" is a

"trade or business is consistent with both the *Groetzinger* test and the underlying purpose of [§] 1301(b)(1)." *Id.* at 883.

The Seventh Circuit held the same firm line in *Cent. States, Se. & Sw. Areas Pension Fund v. Nagy Ready Mix, Inc.* and applied the Leasing Property Rule. 714 F.3d 545 (7th Cir. 2013). In *Nagy*, the lower court refused to hold "that liability must be imposed on Nagy solely because he both owned and leased property to a withdrawing employer." *Cent. States, Se. & Sw. Areas Pension Fund v. Nagy Ready Mix, Inc.*, 2011 WL 3021524 (N.D. Ill. 2011). The Seventh Circuit rejected this approach. *Nagy*, 714 F. 3d at 547. Instead, relying on *Messina* and *SCOFBP*, it held that "Nagy's leasing activity [to a withdrawing employer] is categorically a trade or business for purposes of personal liability under § 1301(b)(1)." The court thus found that the district court erred when it concluded that "Nagy's leasing of property [to the withdrawing employer] did not qualify as a trade or business." *Id.*

With this law in mind, the court now turns to Plaintiffs' motion for reconsideration.

### A. CLARIFICATION OF RULE STATEMENT

Plaintiffs ask the court to reconsider its denial of summary judgment as to Beland in light of the Seventh Circuit's decisions in *SCOFBP*, *Messina*, and *Nagy*. Plaintiffs argue that the court's inquiry should have turned on whether Beland leased property to B&W. If he did, Plaintiffs argue that the court should find that Beland is jointly and severally liable for the withdrawal liability incurred by B&W.

A close review of the Seventh Circuit cases noted above indicates that a more helpful recitation of the rule would proceed as follows: Where an individual (1) owns the property on which a withdrawing employer conducts its operations, (2) leases the

property to the withdrawing employer, and (3) owns the withdrawing employer, then that individual is personally liable for the payment of withdrawal liability incurred by the withdrawing employer. In sum, if an individual engages in a trade or business under common control with the withdrawing employer by leasing his property *to* the withdrawing employer, he is personally liable for payment of withdrawal liability.

### B. APPLICATION OF RULE STATEMENT

The court now turns to the facts of the case before it. Under Rule 56(c)(3), "[t]he court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Although the Rule 56.1 statements could have more clearly articulated that Beland leased the property to B&W, the court finds that the record as a whole clarifies any doubts as to whether Beland leased the property to B&W.

It is undisputed that Beland (1) owns the property on which B&W conducted its operations, (2) leased the property to B&W, and (3) owns B&W. (Pl.'s Local Rule 56.1 Statements, ECF No. 24, ¶¶ 14-16.) In support of these facts, Plaintiffs cite to Beland's deposition and responses to interrogatories. In Beland's deposition, he indicated that B&W paid rent to him:

> Q. [By Plaintiffs' attorney] Now would Beland & Wiegers Enterprises, Inc. pay the partnership rent?
> A. [By Beland] Beland & Wiegers paid the partnership rent, yes, that's correct.
> Q. Do you know what that rent was?
> A. The mortgage payment.

(Beland Deposition at 12:5-13, ECF No. 24-5). Beland also indicated that the mortgage was "with the partnership" because "the partnership or essentially [Beland] owned the property. (*Id.* at 14:16-21.) Additionally, in his answers to interrogatories, Beland indicated that he had a "100%" interest in the land trust that held title to the South

9

Ridgeland property where B&W based its operations and that he owned B&W. (ECF No. 24-6, ¶¶ 4-6.) Plaintiffs argue that the statements in Beland's deposition and his answers to interrogatories make it "clear that Beland leased the property where B&W operated to B&W" and that "Beland's lease operations and B&W are under common control." (Pl.'s Mtn. for Reconsideration, ECF No. 34, 5).

Examining the record as a whole, the court finds that Plaintiffs have sufficiently established that Beland both leased the property to B&W and had common control over the property leased to B&W and over B&W itself. It is clear from the record that Beland owned the land located at South Ridgeland and collected rent from B&W to cover his mortgage payments on the land. Applying the *Groetzinger* standard and the holding from *SCOFBP* to the undisputed facts of this case, the court thus finds that Plaintiffs have established facts sufficient to grant summary judgment as against Beland.

## V. Conclusion

For these reasons, the court grants Plaintiffs' motion for reconsideration and vacates the August 21, 2014 order denying summary judgment against Defendant Daniel J. Beland.

ENTER:

/s/
JOAN B. GOTTSCHALL
United States District Judge

DATED: October 29, 2014